Case number 13-5235, Counsel for Your Logical Interest, Appellant v. Sylvia Matthews Burrell, in her official capacity as Secretary of the Department of Health and Human Services at Elm. Mr. Coffey for the Appellant, Mr. Sanford for the Appellees.  Let's wait until the courtroom clears. All right, Mr. Coffey, good morning. May it please the Court, in 2001 the Centers for Medicare and Medicaid Studies issued regulations interpreting the Stark Law. At that time, the agency expressed a concern about what we call per-click rates, but nevertheless agreed that Congress intended that per-click rates be, quote, protected. The agency also provided what it touted as a bright line as to what is an entity that furnishes designated health services. And the agency agreed that that bright line was necessary given the severe civil and criminal sanctions that attend violations of the Stark Act. In response to these regulations, the Council members invested millions of dollars in buying new lasers, moving vans, other equipped laser fibers, and hiring technicians and other personnel to provide laser surgery. They basically filled a medical need that the hospitals would not meet. They made laser surgery more readily available to Medicare patients throughout the country, particularly in rural areas. And they saved the Medicare system money in doing so. But in 2008, the agency decided that it did not deny any of these consequences, but decided it was nevertheless more important that it create what it called a more level playing field. Decided that it was more appropriate to impose what it characterized as a prophylactic rule because other procedures, not laser surgery, were being abused or there was a danger of abuse. And to accomplish that goal, the agency had to basically reinterpret the Stark Law. And I'm here today to discuss the two about-faces that the agency did. The first was the banning of what we call per-click rates. The second is their new definition, the expanded definition, as to which entity furnishes the designated health service. Let's start with the per-click issue, Your Honor. You basically have here what the government would characterize as a conflict between clauses 4 and 6 of what's called the equipment lease exception. In clause 4, Congress addressed specifically the rental charges that a lessor could impose. But it didn't address specifically the per-click rates in 4, did it? There's no direct reference to per-click rates in 4. That is correct, Your Honor. But there is in the group practice exception, right? I mean, elsewhere they talked about per-service charge. Same statute. One place they address it specifically. Another place they don't. What are we to make of that? Just based on statute. We'll get to your legislative history argument later. But just based on the statute, what are we to make of that? Because Congress is intending to basically authorize two methods of payment in the equipment lease situation. One is a time-based unit, or a periodic payment, we would say. That's like a monthly or yearly basis. And secondly, a per-use basis. It basically gave the option to charge either way. But in section 4, it didn't address that specifically, directly, right? But it did in the group practice exception. In the group practice exception, it allowed what you're calling per-use charge. Specifically. So Congress knew how to address the issue in the statute specifically, but here they didn't. So what are we to make of that? Well, forgive me for retreating to what you said, but the conference report fills that gap, Your Honor. Okay. But let's just take the statute alone. We'll get to legislative history. But on statute alone, you have to agree, right? That in one section of the statute, Congress talked about per-use and authorized it, right? Correct. In the section that you're relying on, Congress didn't say anything about it. Well, because it allowed both methods, both per-use and periodic payments. But it doesn't somehow suggest that per-clip was banned as the government suggested it was free. No, I think the most you can make of this little analysis is there's some ambiguity, right? Correct, Your Honor. I mean, understand our principle is that Congress set forth standards that would be met. That if an equipment lease. Well, you always say you don't want there to be ambiguity here. But actually, Your Honor, ambiguity doesn't hurt us. Okay. Under Chevron step one, this Court has declared that even in the face of textual ambiguity, for Chevron step one purposes, you can look at whether Congress has spoken to the issue through the text of the statute and the legislative history. And the legislative history here could not be more categorical. And it's ironic that in 2008. Is that right? I mean, once again, I mean, there's no question your legislative history argument is, in my mind, is the stronger of the two arguments that you've raised. But does the legislative history compel your conclusion or simply allow it? Compelling, Your Honor. It says per unit charges may be based. May, okay. It's authorizing it. May be. But that doesn't mean they have to be. Does that mean that they must be? Well, they can't must be because they have two ways, either per time or per use. That's right. I mean, it's given a choice, but it says may be, and it's basically authorizing, I guess, two alternatives. One is time-based, the other is per unit based. But it authorizes the per-click charge if you use not time-based but use-based. Correct, Your Honor. So if it authorizes, I mean, if it authorizes two ways and then the legislative history says, in this second way, here's what you can do, I don't see how the legislative history could say, in this, I guess it could say, in this second way, this is what you have to do. But it does authorize. The whole point is that the Congress set forth conditions to meet the exception, and one of the conditions dealt with the charges. And if you meet the specific conditions for the charges, then you fall within the exception and therefore not subject to these dark acts. So frankly, it does violence to suggest that you have to basically say they have to be permitted because that's not the way the structure of the statute is set up. The government's theory is that, as suggested in its brief, is well, Congress really intended to prohibit per-click rates. And frankly, I don't think it has any support in the text of the statute. Under that theory, if Congress really meant to insist on time-based rates, which really is the only other choice, it could have said so. In fact, if you look at 42 U.S.C. 1395, that specifically requires a monthly fee or other basis for an aggregate of services provided over a period of time. It's also significant that an earlier version of the Stark Law called for payments for office space leases, which are similar to equipment leases, to be on a periodic basis. With Stark, Congress deleted that and changed the structure of the office lease exception and also chose not to include the phrase periodic payments in the equipment lease section. Now, the government's position on the field really is that it really doesn't matter what Clause 4 says. The government's position is that Clause 6, I guess, takes precedence. It's sort of a supremacy clause, if you will. If Congress truly intended to give the Secretary the power to override what Congress specifically said it intended in the conference report, there are other ways to do it. For example, in the conference report, Congress could have said, we allow per-click rates except as the Secretary may otherwise provide. Nothing to that effect in the conference report. Secondly, if Congress truly intended to give the Secretary some kind of right to restructure or rewrite Clauses 1 through 5, Congress could have said, except as the Secretary may otherwise provide, here are the following five clauses. Indeed, Congress did that elsewhere in the statute, in the Medicare Act. For example, if you look at Section 1395CC-1A3, Congress said, except as the Secretary may otherwise provide. The term physician means any individual who furnishes services which may be paid for as physician services under the sub-chapter. I know, but to get where you want to get, you have to rely on this legislative history, correct? Because the language that Congress used in Clause 4 doesn't get you where you want to be. Because the language is not the way Congress would do if it was using Clause 6 to limit the Secretary. It says, and. Any other. Such other. Such other. As the Secretary. Correct. So, 4 doesn't give you anything, is what I'm trying to get at. You have to go to the legislative history. And the legislative history, as the Secretary originally interpreted it, it uses, as you said, the word protected. And then it says, so long as. And then it goes on for paragraph explaining how it's reading this. And then it comes along in 2008 and says, well, we see this so long as clause. These are my words. But we see this so long as clause as contemplating the very thing that Congress in the statute said couldn't happen. I mean, isn't that what's happening here? No, Your Honor. No. Okay. Well, it's partially correct. It's a little more complicated. In 2001, the agency viewed the conference report as an impediment to doing what it otherwise wanted to do. No, but it explained what it meant by that. It didn't just stop with the word protected, period. True, but. It went on to explain. True, but it viewed itself as bound by the congressional statement of intent in the conference report. More importantly, the agency did not conclude that notwithstanding what Congress said in the conference report, we, the agency, have the power under Clause 6 to prohibit perfect leases. And indeed, in 2008, the agency did not take that stark of a position. No pun intended. The agency essentially said, we have revisited the definition or the legislative history. We conclude upon our review of legislative history that the congressional intent was not so clear-cut. Again, in 2008, the agency didn't say, does it matter what the conference report says? We exercise our authority under Clause 6. That is a creation of the government's, that's a position the government has taken in this litigation. That's not what the agency said in 2008. Help me understand, back on the legislative history argument and educate me on this one. I mean that, I mean that. So as I understand the way legislative history works in Chevron, that when there is a statutory provision that's clear, we have authority that says we can only use legislative history to show that maybe it's not as clear as we thought. Maybe there's some ambiguity here looking at the legislative history. But I'm not aware of any case law that does what you're asking. And that is to say, where if we decide the statutory language isn't clear here, but legislative history can be used to make it clear. Yes, Your Honor. Are there cases on that? Yes, Catawba County would be the most prominent example, Your Honor. Okay. If I could quote. It says, a statute may foreclose an agency's preferred interpretation despite such textual ambiguities. If its structure, legislative history, or purpose makes clear with its text, please don't take it. But isn't that consistent with what Judge Griffith is saying as to how legislative history is used at Step 1? Well, if Congress has spoken clearly, or the Court thinks it has, you can apply all of these traditional tools of legislative interpretation. To determine whether Congress has spoken directly, you apply the traditional tools. So even if you look at the plain language Congress enacted, and you contrast it with other language where Congress specifically addressed what you are urging, we can take the language that has the six clauses connected by an and, where Clause 4 doesn't give you anything unless you go to the legislative history to get that right? Your Honor, I disagree with the notion that Clause 4 does not give me anything. It addresses what has to be met as far as rental charges. It spells out the three criteria. If those three criteria are met, then the joint venture would fall within the exception. If Congress intended for the agency to be able to revisit what Congress already addressed in Clause 4, it could have, as I said before, provided a prefatory clause saying, except as the Secretary of the Ranks provides, which Congress has done elsewhere in the Medicare statute. So the fact that Congress used different language that is directly the language you want to be imported into Clause 4, the fact that it used that language elsewhere is no indication of what Congress intended? As distinct from Congress saying in the legislative report, this may be done, but the Secretary, if she finds abuses, et cetera. Yes, Your Honor. Again, given the fact that it was allowing more than one way for the charges to be set. That's correct. In other words, you have Congressman Stark coming on strong on this issue. All right? And you have a complex statutory scheme that has tremendous fiscal impact, and Congress can't monitor this thing daily. So it wants the Secretary to have authority to make changes that the Secretary determines, protect the program, and protect against patient abuse. That's a very broad authorization. Your Honor, I respectfully disagree because it says other conditions. I will grant you that if Congress has said any such conditions that the Secretary may impose, that would indicate a congressional intent. And it would be different if 4 referred specifically to what you say the legislative history provides. But it doesn't. Well, again, because Congress has spoken directly to the issue through the Congress report as to what Clause 4 means. So why didn't it put it in the statute? Your Honor, I wish I could answer that. No, but that's my point. That you had these three different approaches in Congress. You had the two House committees, and you had a Senate bill. And the Senate bill went along with the House committee that said you can have, my word, per click. But it didn't limit the Secretary in terms of this Clause 6 authority, did it? Well, granted, but again, the conference report also made no reference to the Secretary having any residual power to counterman what Congress declared in the Congress report. But it said may. May be phased. It's an authorization to do it. But wouldn't it have been clearer if it had said, and the Secretary may not make any changes? Yes, that would have been clearer. And the conference report doesn't say that? That is correct, Your Honor. And neither does the statute. No, but it talks about other condition. And that's where the decision in the Financial Planning Association is relevant here. Congress, their report focused on what is the significance of the word other. And their, this Court, over a vigorous dissent that frankly adopted or echoed some of the arguments that everyone's making here, the majority in that case agreed that the word other has significance. Different statutory text. That's my whole point. Well, agreed, but still with the same focus on the word other. But different statutory text all around it. That's what makes it different. I mean, you can't just take two statutes and push them together when the text is different. Correct. But the government's interpretation would strip the word other of any meaning. It basically would be read that the Secretary can impose any conditions, even if they've already been addressed in Clause 4, Clause 2, if she deems it necessary to protect against patient or... In other words, Congress says, here's an exception. And here are the things that can happen under this exception. All right? And then it says, and such other requirements as the Secretary. It doesn't say, and such other requirements not otherwise set forth above. Well, with all due respect, Your Honor, that's implied in the word other. And in the financial case, because of the way Congress wrote the statute, that was clear. And in the Rule 60B case, because of the way Congress wrote the statute, it was clear. But Congress didn't write the statute that way here. That's all I'm getting at. Well, actually, Your Honor, the panel felt necessary to consult the legislative history to ascertain what exactly Congress meant in the statute. And concluded, as a matter of Chevron Step 1, that the agency's effort to use its power to create other exemptions gave it a power to basically expand an exemption that Congress provided. So the way you read this is that even if the Secretary were to conclude that the rental charges are creating conditions in which there is patient abuse and inconsistent with Congress's overall goals in the program, there's nothing the Secretary could do? The Secretary would have to go back to Congress, get an amendment? As far as the statute, yes. But it certainly doesn't leave the Secretary without any tools in her tool kit. If she believes that a physician is improperly treating patients, they can be debarred from the Medicare program. If there's the belief that the patient is being improperly referred to garner a compensation... So she has to proceed physician by physician. Meanwhile, the program is going down the drain. In my hypothetical, all these patients are being abused. She would have to exercise the other statutory tools in the tool kit, yes, Your Honor. But keep in mind that... Why would Congress want to limit the Secretary in this manner that you're suggesting? Because the whole statute is a series of limitations, Your Honor. Look at it the way it's structured. It's not as if Congress said every medical procedure is subject to the Stark Act.  And frankly, laser surgery is not one of the ones that's identified. The only reason that we're even here is because laser surgery by virtue of a Secretary's regulation is viewed as coming within the scope of the Stark Act if it's done in a hospital. Congress would not view the procedure as inherently deceptible to abuse. Well, I mean, the Secretary said you don't have to come in a hospital. You can do it outside of the hospital. Well, actually, that's not a viable option because... Well, you want the higher reimbursement rate. I understand that. But, I mean, that's the Secretary speaking. No, it's the ASCs want a higher reimbursement rate. I mean, they don't want the doctors there because they don't get paid enough for it. The ASCs are owned by third parties. Okay. Okay, Your Honor, I'm... Can I ask you, you haven't had a chance to talk about the second, furnishing and underarrangement. Let's assume that you're right on the per click. Isn't that just a pyrrhic victory? Because I cannot see how a group of urologists is able to perform laser surgery, even with a per click lease, because of the change in furnishing. And my first question is, how does more than one urologist working together do it now? Well, it's not a pyrrhic victory, Your Honor, because if you look at the SART regulations, the agency said that it would not view a pure equipment lease as being an example of furnishing a service. The reason we're here, frankly, is because traditionally laser is viewed as a bundled service. That is, Medicare pays one technical fee, but it covers a whole bundle of services provided, some by the hospital, some by the physician joint ventures. For example, if the hospital provides the operating room... Okay, we know all that. We know all that. It's possible... I mean, there's almost 6,000 hospitals in the country, Your Honor. It's likely there will be a few who would be glad to do a per click lease, because, like we said in our brief, that insulates from any financial risk. The hospital gets paid on a per click basis. If it pays on a per click basis, then it doesn't have to worry about whether it's going to do enough procedures or not. But if you scale back how much input comes from the joint venture, then there's less of a risk of the joint venture being viewed as furnishing the service. In other words, if it's a pure lease without the technician being provided by the joint venture, without some of the other services... In other words, if it's all done either by the hospital or another third party, then you've basically reduced it, not eliminated that risk. It's not an ideal situation. The council members would prefer to be doing what they did before, which is to provide... You say if it's done by a hospital or a third party, you have done what with regard to risk? You've reduced the risk, not eliminated it, that the joint venture will be viewed as performing the service. Oh, I see. Yeah. Which... Okay. I realize I'm well beyond my allotted time. If there are no more questions, we'll give you a couple minutes to reply. On the refurnishing issue or... I don't want to wear out my work. I'll send a reply, Your Honor. Mr. Sandberg. Good morning. May it please the Court. Jeff Sandberg for the Secretary of Health and Human Services. Would you address the furnishings change first? Yes. The Secretary reasonably exercised her authority in revising the regulatory definition    does not apply to health services. The definition of entity furnishing does not apply to health services. Prior to 2008, the Secretary interpreted that phrase as only speaking to the entity that bills Medicare without regard to who is performing the services. Right. What the Secretary changed in 2008 was to interpret the phrase entity furnishing designated health service to include the entity that actually performs the service and the entity that bills Medicare for it. Because what was happening was there were entities that were performing the whole service and contracting away the billing of Medicare and that was a way of avoiding stark law scrutiny of the venture that was performing the service. So... Wait a minute. They were contracting away the billing with the hospitals all along, weren't they? That's right. Most of the time when an entity is billing Medicare for a service, say a hospital is billing Medicare for a service, the hospital is performing the service itself. So where this regulatory change has some teeth is precisely in the under-arrangements relationship where a hospital is contracting with a third-party provider to provide services to the hospital's own patients. And for many years, the Secretary allowed these arrangements precisely because you can imagine circumstances in which it's not economical for a hospital to maintain all of the facilities, the equipment, the expertise, the staff necessary to perform certain operations. But what the Secretary was discovering was that more and more things that hospitals used to do themselves were now being contracted away to third parties and that these weren't just any old third parties. They were physician-owned third parties. The hospitals were... Let me stop you right there. Unless you're talking about hospital-based doctors like pathologists and radiologists, the hospital didn't perform the services that the doctors were performing. Unless I'm just confused. You said the doctors... I mean, the hospitals are performing their services. They're not performing medical services. The doctors are performing the medical services. That's right. And the clarification is that there are two different kinds of payments that are made for the services we're talking about here. There's the doctor's own labor and the physician, whether an operation is performed in a physician's office or an ambulatory surgery center or a hospital, the physician is paid through the physician fee schedule. This case is really about the technical fee, a separate fee that is not for the doctor's labor. It's for everything else, the overhead, the equipment, the supplies. And so what was happening was that the hospital bills Medicare at the hospital rate for the technical component of the service and then engaged in these relationships with physician-owned third parties to actually furnish the services. And the secretary saw that more and more of this was happening and concluded that what was happening was that hospitals were feeling pressure to contract with these physicians because physicians control referral streams to hospitals. Physicians are the ones who are seeing the patients and deciding whether this patient is a good candidate for surgery or not, what type of surgery, and where should the surgery be performed. And hospitals were aware that if physicians were engaging in collateral business ventures to own equipment and lease them to hospitals or to contract with hospitals to perform services, if the hospitals didn't contract with those physicians, the physicians may enter into arrangements with other hospitals elsewhere. So what the secretary was trying to do here was to prevent under-arrangements relationships that didn't have, you know, a real business reason other than to allow physicians to not only make money off being physicians, but also to make money off being, providing part of the technical component of Medicare reimbursement. In other words, as businessmen. Right. As lessors. That's right. All right. On the per-click issues, I think the court has focused on Clause 4, and the question here really is the scope of the restrictive force of Clause 4. And there's ambiguity at multiple levels here, and that means that under Chevron Step 2 that the court defers to the agency's reasonable interpretation of the statute. I heard... So you're understanding that it is a matter of law that we can look at a statute, say it's ambiguous, but have it clarified at Chevron Step 1 through legislative history? That's certainly not the court's general practice here, and I didn't read Catawba County to reach that conclusion. But here, you know, the legislative history does not compel the conclusion that the secretary has foreclosed from invoking her Clause 6 power to protect against program or patient abuse. And I think Judge Rogers' hypothetical was illuminating. Congress intended a broad authorization to the secretary to take steps when the secretary saw abuse happening on the ground. And if Congress had intended its characterization of Clause 4 on the legislative history to prohibit the secretary to tie her hands from addressing program or patient abuse in the future, you certainly would have expected Congress to say that, and you would have expected to see... What do you make of the statement in the committee report? Well, it's one statement. It's a statement by Congress as to the scope of the restrictive force of Clause 4. The agency has interpreted this as an indication that Congress intended Clause 4 to be doing less rather than more work. One can read Clause 4 on its face and interpret it as banning all per-click leasing arrangements, just in general. What the legislative history here suggests is that Clause 4 is capable of another interpretation, under which per-click leasing arrangements are allowed so long as every time you click, the same payment comes back, that the amount of the payment doesn't vary over time. So the ambiguity in Clause 4 is the restriction all per-click leasing arrangements or just per-click leasing arrangements in which the amount of the payment changes during the life of the lease. But either way, Clause 4 doesn't say, and the secretary has foreclosed under Clause 6 from taking action to prohibit that which Clause 4 does not itself restrict. This is a circumstance in which Congress intended to empower the secretary to act against program or patient abuse. I think I heard my opposing colleague refer to the legislative history as suggesting that per-click relationships were supposed to be, quote, protected, but the legislative history nowhere says that per-click leasing arrangements are supposed to be protected. It's just about the... No, but that's, I think what he was, I understood him to be referring to the reference at JA-97, which is in the 2001 rule, where the secretary is saying, quote, we have reviewed the legislative history with respect to the exception for space and equipment leases and concluded that Congress intended that time-based or unit-of-service-based payments be protected. And my focus was on the next clause, so long as, but in any event, that uses the word protected. That's right, Your Honor, but there's a critical difference there. That's the agency's prior interpretation, that prior judgment as to what it was going to do. This is not instructions from Congress. So then it comes along later and says, well, we've further analyzed the legislative history, and we no longer believe the interpretation we adopted earlier is the only reasonable interpretation of the statute and legislative history. So is the agency saying this is a Chevron Step 2 issue? Yes, it is a Chevron Step 2 issue. The agency is saying Clause 4 does not tie our hands from using Clause 6, and the agency then goes on to invoke its power under Clause 6 to promulgate other requirements as needed to protect against program or patient abuse. If the Court has any further questions about the case, I'd be happy to entertain them. Otherwise, I think the panel has a good handle on the case, and we rest on the arguments in our briefs. I have one very simple question. Can two urologists perform laser surgery in a hospital as long as they are not lessors of any equipment? Yes, and I think that's a very good question. And even if they are lessors of equipment, they can do so if it's just an equipment lease and if the equipment lease is not structured on a per-click basis. Or physicians could be employees of a third-party venture that contracts under arrangements with the hospital, and so long as there are compensation exceptions that cover both links in that chain, the urologist could also perform that. So there are actually many services that don't need to be performed in hospitals, can be performed in ambulatory surgery centers. If the plaintiff's member organizations wanted to form their own ambulatory surgery center and participate in Medicare suppliers, nothing forecloses them from doing so. What the Secretary saw was that procedures are being billed at the hospital rate unnecessarily and through these relationships that allow physicians to monetize their referral streams. Thank you. Thank you. Does Mr. Coffey have any time left? All right, why don't you take two minutes? I'm sorry? Why don't you take two minutes? Thank you, Your Honor. I'd like to address the issue of furnishing. Two points. Mr. Sandberg indicated that he stated accurately, and I fully agree with him, that for the vast majority of providers, the expanded definition of furnishing has little impact because the entity that bills Medicare and the entity that performs the actual work is one and the same. The concern that the agency had was that certain physicians who normally could bill directly Medicare were billing under arrangements with hospitals in order to take advantage of the higher rate. Well, that situation doesn't describe the council members because they could never bill Medicare directly. They have to operate under someone else's aegis. And lastly, you have, I guess, when you talk about the teeth, it's the teeth that causes the fair warning concern here. The statute, as Mr. Sandberg alluded, has severe sanctions. You have a $15,000 per charge civil penalty. You also have potential criminal penalties. And in this case, the agency has not just refused or failed, it has refused to provide clarification on who performs the service when you have a bundled arrangement that I described earlier. Those were brought to the attention of the agency in 2008. The agency recognized the comments describing concern about the ambiguity in the scope of the statute. The agency did not respond by trying to provide clarification. The agency said, well, we believe that the common definition of performs will provide sufficient guidance. Well, it may in the ordinary case, but it doesn't in this particular situation, Your Honor, because, again, you have two different players providing services, and it's not clear whether the hospitals view this performing the service, the joint venture, or both. And both could be subject to the penalties of the statute. And even worse was that the agency said, okay, provide some comments, and then we will consider giving the guidance. Four years later, in 2013, the agency refused to give the guidance on the basis that it didn't get enough comments, and the comments were not unanimous as far as the recommended course of action. Not aware of any principle of administrative law that the agency has to have unanimity as far as the comments it receives. And certainly, in 2008, the lack of consensus on the comments didn't stop the agency from issuing those regulations. And today, on the part of the agency to provide clear guidance in a situation where the consequences can be quite severe. And that is a violation of the APA. All right. Thank you.